HARRY HASTINGS ATTRACTIONS, Plaintiff, *v.* TOM HOWARD, Defendant.

Supreme Court, Kings Special Term, September, 1922.

Injunction — contract for personal services of vaudeville actor — construction of contract — when injunction granted pendente lite restraining actor from performing for any one other than plaintiff.

In a proper case the breach of a contract for personal services will be restrained by injunction.

Where nothing in a contract for personal services leads to the belief that all disputes thereunder between the parties were to be submitted to arbitration, a clause of the contract that any dispute as to any claim in respect to salary shall be submitted to arbitration cannot prevent the court from entertaining and determining a controversy which might otherwise arise.

The rule is that to warrant the court to intervene and restrain a breach of such a contract the service must be unique, special and extraordinary.

A contract for the professional services of defendant as a burlesque comedian for four seasons with option to plaintiff to renew the contract for a further period of two seasons contained a negative covenant whereby defendant admitted that his services were unique, special and extraordinary, and that in no event would he enter the service of another, but if he did plaintiff should apply to a court of competent jurisdiction for an injunction to restrain the violation of the contract and that defendant would not in an action for the breach plead as a defense that his services were not unique, special or extraordinary, or that an artist could be obtained to render similar services.   In an action to restrain defendant, who during the life of the contract left the employ of plaintiff and entered the service of another, from continuing in such service, *held*, that whether the services of defendant are unique, special and extraordinary was a question to be determined by the court as one of law.

A consideration of the facts leading to the belief that the services of defendant are unique, special and extraordinary, plaintiff's motion for an injunction *pendente lite* is granted.

MOTION for injunction *pendente lite*.

*James A. Timony* (*James A. Timony* and *Harold M. Phillips*, of counsel), for plaintiff.

*Snitkin & Goodman* (*Leonard A. Snitkin* and *Samuel H. Golding*, of counsel), for defendant.

CALLAGHAN, J.  On the 12th day of November, 1920, the parties to this action entered into a contract by which the defendant was engaged to render professional services as an actor for a period of four seasons, with an option to plaintiff to renew for a further period of two seasons.  The defendant has left the employ of the plaintiff and has entered the service of another.  It is to enjoin defendant from continuing in the service of another that this action is brought. The defendant resists the granting of an injunction upon various grounds: (1) That the contract has expired and that the plaintiff did not exercise its option to renew; (2) that the contract was terminated by mutual consent; (3) that there is an adequate remedy at law; (4) that the services of the defendant are not unique, special and extraordinary.

The contract in the 1st paragraph specifically provides that defendant is engaged for the theatrical seasons " 1921 & 1922, 1922 & 1923, 1923 & 1924; " and in paragraph 9 the contract provides that " It is further agreed that the Manager shall have and it is hereby given the right and option to renew or extend this agreement, after the conclusion of the engagement of the season of ' 1922 ' as aforesaid, from season to season, for a period of two successive seasons, upon the same terms and conditions as herein set forth, season 1923 and '24, at two hundred dollars, such right and option to be exercised by the Manager giving to the Artist written notice," etc.  It is perfectly apparent upon a reading of the two paragraphs that the insertion " 1922 " in a blank space in the contract was an inadvertence and that the parties intended that the option to renew was to extend from the close of the season of 1924, which is the time when the contract between the parties would terminate in the absence of an enlarging clause.  Incidentally, the contract in the possession of the plaintiff has been changed apparently by the same scrivener at the same time the contract was made, so as to read " 1924."

I am not impressed by the defendant's contention that the contract was terminated by mutual consent.  Such is the assertion of the defendant and it is denied by the plaintiff.  The truth can best be determined from the probabilities.  There seems to be no reason whatever why plaintiff should terminate the contract. The defendant had proved to be a success in the attraction staged by this plaintiff.  He had received favorable comment in the press

in the various cities in which he had played and gave promise of rise to great heights as an actor on the burlesque stage from the commencement of this contract. It is contrary to the usual actions of men under such circumstances to assume that plaintiff would desire to cancel a contract which gave to it the assurance of satisfactory returns.

It is not unusual in actions of this character for defendants to assert as a means of defeating an injunction that plaintiff has an adequate remedy at law and should be relegated to an action for damages for breach of contract. The contract provides that the defendant should receive employment not less than thirty weeks each season during the life of the contract and that, in the event of his inability to appear, "a *pro rata* deduction may be made from the salary based upon the total number of performances given" in any week when defendant was unable to appear; and, further, "on the breach by the artist of this agreement the artist agrees to pay to the manager the amount specified in Paragraph VII hereof, and in addition thereto, a sum of money equivalent to the total amount which the arbitrator may decide during the entire term of this agreement as specified in Paragraph I hereof, if he had faithfully performed the same, as partial compensation for the damage to the manager by reason of said breach, the exact or entire loss, damage or injury which the manager may sustain by reason of said breach being incapable of estimation or ascertainment; and said sum is agreed upon as partial compensation and not as a penalty." The contract further provides: "The parties hereto agree that if any dispute shall arise between them in respect to salary or a claim to salary, and the same cannot be amicably adjusted between themselves, in that event such dispute shall be submitted and referred to the determination and award of three arbitrators." The contract further provides the method of selecting the arbitrators.

It is seen, therefore, that the damage provided for in paragraph VIII is limited to any claim which may arise " in respect to salary or a claim to salary." There is nothing in the contract to lead one to the belief that all disputes between the parties were to be submitted to arbitration. They anticipated, possibly, some financial disagreement and provided a method for settling any dispute which might arise in that regard. In no event, however, can such a clause prevent the court from entertaining and properly determining a controversy which might otherwise arise. It was not apparently the intention of the parties to submit such a dispute as has arisen here to arbitrators, but in no event can the parties make a binding agreement which will deprive the court of jurisdiction to entertain

and settle the controversy between the parties.  *Benson* v. *Eastern Bldg. & Loan Assn.*, 174 N. Y. 83; *McLean* v. *Tobin*, 58 Misc. Rep. 528, 530; *Buel* v. *B. & O. Southwestern Ry. Co.*, 24 id. 646, 662. We are led, therefore, to a consideration of the real dispute between these parties.  There is an issue sharply raised as to whether or not the services of this defendant are of such a character as to warrant the court to intervene and restrain a breach of the contract. The rule is that the service must be unique, special and extraordinary to warrant the invocation of a court of equity.  The courts have been forced, in order that justice be done, to change the original position which was assumed in the early history of this kind of litigation.  As far back as 1833 the rule was announced that contracts for personal services are matters for courts of law, and that equity would not intervene.  *Hamblin* v. *Dinneford*, 2 Edw. Ch. 529.  That authority was approved and followed in *Sanquirico* v. *Benedetti*, 1 Barb. 315, and *DePol* v. *Sohlke*, 30 N. Y. Super. Ct. 280.  But later the courts of this state reached the conclusion that breaches of such contract would in proper cases be restrained. *Duff* v. *Russell*, 14 N. Y. Supp. 134; affd., 133 N. Y. 678; *Daly* v. *Smith*, 49 How. Pr. 150; *Hoyt* v. *Fuller*, 19 N. Y. Supp. 962; *Shubert* v. *Angeles*, 80 App. Div. 625; *Hammerstein* v. *Sylva*, 66 Misc. Rep. 550.  The same rule has been repeatedly announced by the federal court in this jurisdiction.  *Comstock* v. *Lopokowa*, 190 Fed. Rep. 599.

The contract contained a negative covenant whereby the defendant, no doubt grudgingly, admitted that his services were unique, special and extraordinary, and that he would in no event enter the service of another, and that in the event that the plaintiff should apply to a court of competent jurisdiction for an injunction to restrain the violation of this contract he would not set up or interpose in such an action the defense that his services are not unique, special or extraordinary or that an artist could be or can be obtained to render similar services.  The estimation which he has of his ability as an artist is, however, not controlling, as the question whether his services are unique, special and extraordinary must be determined by the court as one of law; and if a consideration of the facts leads to the belief that such is the character of the services of this defendant, an injunction could issue to restrain him from breaching his contract.  Men should be compelled to perform their contracts in proper cases.  Unjustifiable breaches of contracts should never be countenanced.  The difficulty in all cases of this character is to determine whether or not the services of an artist come within the category of those mentioned in the various decisions upon this subject.  It is not always an easy question to determine.

Supreme Court, September, 1922.          [Vol. 119

This defendant is on the burlesque stage. That, however, in itself does not mean that his services are not unique, special and extraordinary. Men may show such service in any walk of life. A horseshoer may be so proficient in his work as to fall within this class. The same is true of a carpenter or of a mechanic. It cannot be determined by the particular calling but by the personality exhibited in the conduct of one's work. It has been held that a baseball player may be enjoined from entering into the service of another during the period covered by his contract. *Cincinnati Exhibition Co.* v. *Marsans*, 216 Fed. Rep. 269; *Metropolitan Exhibition Co.* v. *Ward*, 24 Abb. N. C. 393; *Phila. Ball Club, Ltd.*, v. *Lajoie*, 202 Penn. St. 210. I know of no better way to determine whether this defendant falls within the class mentioned than by a perusal of the critiques of persons in his calling. The defendant was on the circuit in the employment of this plaintiff during the season of 1921–1922, and plaintiff has gathered and submitted upon this motion clippings from the newspapers in the various cities where the defendant appeared. It may be well to quote what the critics have said concerning him. The Cincinnati *Enquirer* said of the defendant: " Howard, who is lean and lanky and funny in appearance, looks as well as acts the part of the boob. He has at times the blankest expression that any one wears outside of the state hospital. He is funniest when he becomes most confidential, as in the hold-up scene." The Cincinnati *Post* said, speaking of the play entitled " Knick-Knacks," in which the defendant took a leading role: " It contains a series of scenes interspersed with a great deal of Tom Howard's dry humor. He had his auditors with him from the start." The Des Moines *News* said: " Howard is the show. He is one of the best low-comedians to catch the eye of this reviewer in many, many moons." The Omaha *Daily News* said: " Howard is new to burlesque and his comedy is new to the stage. Howard doesn't smile, he promotes laughter from his auditors." The Detroit *Journal* said: " Howard is a new type of hick comedian. He does not ' telegraph ' his wit and then wait for the laughter or applause. He reels off joke after joke, and his audience rewards him with a steady gale of wholesome laughter and handclapping." The *Mail and Empire*, Toronto, said: " Howard is a treat. From the opening scene to the drop of the curtain he kept the audience convulsed with laughter by his funny characterization of a ' simp.' Howard's characterization of a hold-up man is one of the funniest features of the whole show." The Buffalo *Courier* said: " Howard is genuinely funny, and in every scene injected a lot of his extemporaneous wit that brought down the house." The Utica *Herald-Dispatch* said: " Tom Howard,

Misc. 326]          Supreme Court, September, 1922.

the comic, is a scream all the time he is on the stage. He has an original make-up and line of chatter that never fails to bring down the audience in convulsive laughter." The *Post-Express,* Rochester, said: " Tom Howard is the featured comedian and he proved himself worthy of the honor. His methods are clever and much of his material new and the combination leaves no room for improvement." The *Democrat and Chronicle,* Rochester, said: " Tom Howard, the featured comedian in this week's show, has an original method of extracting laughs from his audience." The *Knickerbocker-Press,* Albany, said: " Howard has created a boob character that is a delightful surprise. In the holdup bit he is immense; in the king impersonation he is a scream." The Albany *Evening Journal* said: " Howard has created a boob character that fits well in burlesque realms. Not a smile does he crack during the entire performance, his humor being of a dry nature." The Boston *American* said: " A comedian who is new to Boston burlesque lovers made his local debut yesterday in ' Knick-Knacks.' * * * He is Tom Howard and he presented a brand of comedy distinctly novel and different." The *Journal-Courier,* New Haven, said: " Tom Howard as a ' boob ' characterization, is especially funny. He is on the stage the greater part of the time, in a different role each time. His work as the ' Holdup Man ' is remarkably clever and draws countless laughs from the audience." The New York *Clipper,* a newspaper devoted to the news of the stage, said on September 20, 1922, of this defendant after he had entered into the employ of one other than the plaintiff: " Tom Howard, main performer in the show, a comedian who is as distinctly original and drolly comical as we have ever seen anywhere." Zit's *Weekly Newspaper,* another publication devoted to the news of the stage, said on September 22, 1922: " In Tom Howard Broadway has discovered a comedian of merit, whose eccentric, droll manner made him one of the most talked of comedians on Broadway since Jim Barton deserted burlesque, a few years ago."

Aside from the estimation which the critics entertain as to the ability of the defendant as a unique, extraordinary and unusual comedian, the papers in opposition to this motion lead to the conclusion that defendant is of the very type asserted by the plaintiff. He is now on what is known as the Broadway stage. By the affidavit of his present employers he is the principal character in the show, without whom the present attraction would be of little or no value. It is hardly consistent to say that a burlesque comedian was so adept as to be the principal character in a Broadway burlesque show and at the same time to say that he is of ordinary ability and in a class with many other mediocre actors.

I conclude that although the defendant is on the burlesque stage he is a comedian whose services are unique, special and extraordinary, and that irreparable damage will be suffered by this plaintiff if the defendant is not restrained and that the situation disclosed here warrants the intervention of the court in order to save the plaintiff loss and damage, the amount of which cannot be reasonably estimated or determined. This motion is granted. Amount of undertaking to be fixed on settlement of order.

Ordered accordingly.