BENJAMIN F. DE AGOSTINA, as President of the Allied Motion Picture Operators Union, a Voluntary Unincorporated Association of Seven or More Members, etc., Plaintiff, *v.* PARKSHIRE RIDGE AMUSEMENTS, INC., Defendant.

Supreme Court, Kings County, February 1, 1935.

*Murray E. Harston* [*George A. Spiegelberg* of counsel], for the plaintiff.

*Julius Steinberg,* for the defendant.

STEINBRINK, J.   This case is presented on stipulated facts.   The plaintiff labor union is composed of a membership of licensed motion picture machine operators.   The defendant owns and operates several motion picture theatres in the borough of Brooklyn.   On August 3, 1934, the parties hereto entered into two contracts under which the plaintiff union agreed to furnish and the defendant to employ at its theatres only motion picture machine operators who are members of the plaintiff union.   When these contracts were entered into, and for a long period prior thereto, the defendant had been employing Empire State Union operators.   The plaintiff union was aware of this.   The defendant commenced performance of the agreements which had been entered into with the plaintiffs (hereinafter referred to as the " closed shop " agreements) by discharging

from its employ the Empire State Union members and hiring in their stead five members of the plaintiff union, who are here named as individual plaintiffs. Thereafter the discharged operators filed a complaint with the Regional Labor Board charging the defendant with violation of section 7 (a) of the National Industrial Recovery Act (U. S. Code, tit. 15, § 707, subsection [a]) (hereinafter called the NIRA) and of the motion picture code adopted thereunder, in that the defendant had discharged and discriminated against members of the Empire State Union simply because they were not members of the plaintiff union. After the complaint was heard by that board, the defendant discharged from its employ the members of the plaintiff union and re-employed the Empire State Union operators who had been previously discharged. On the basis of these facts the plaintiffs seek a judgment restraining the defendant from violating the " closed shop " agreements by employing as motion picture machine operators any persons other than those furnished by the plaintiff union and from otherwise breaching these contracts. The plaintiffs also ask for a money judgment measured by the loss to the individual plaintiffs of the wages to which they claim to be entitled.

In substance, the defendant contends that the " closed shop " agreements violate section 7 (a) of the NIRA (U. S. Code, tit. 15, 707, subsection [a]), the Code of Fair Competition for the Motion Picture Industry adopted thereunder (hereinafter called the code), and chapter 781 of the Laws of 1933, commonly known as the State Recovery Act, and as a consequence should not be enforced in equity. " Closed shop " agreements do not contravene any public policy (*Jacobs* v. *Cohen*, 183 N. Y. 207), and are specifically enforcible in equity (*Schlesinger* v. *Quinto*, 201 App. Div. 487; *Goldman* v. *Cohen*, 222 id. 631; *Ribner* v. *Rasco Butter & Egg Co.*, 135 Misc. 616; *Farulla* v. *Freundlich, Inc.*, 152 id. 761; 153 id. 738). Courts do not prescribe an employer's choice between rival labor unions. Having chosen to enter into a " closed shop " agreement with one labor union to the exclusion of another, an employer's contractual obligations are to be no less observed. Was the enactment of section 7 (a) of the NIRA and the adoption of the code intended to change the existing rule by outlawing agreements such as the ones in suit? Subdivision 2 of section 7 (a) (U. S. Code, tit. 15, § 707, subsection [a], subd. [2]) provides as follows: " That no employee and no one seeking employment shall be required as a condition of employment to join any company union or to refrain from joining, organizing, or assisting a labor organization of his own choosing." This provision is restated in the code (Art. III, § 1-b).

There is no claim asserted here that the plaintiff is a company union. Under the " closed shop " agreements, the Empire State Union operators would not be required, as a condition of their continued employment by the defendant, to refrain from joining, organizing or assisting a labor organization of their own choosing. The " closed shop " agreements do not expressly provide that members of the Empire State Union, in the defendant's employ, be discharged unless they join the plaintiff union, and no such provision may be read into the agreements under the guise of construction. True it is that, in order to comply with the terms of the " closed.shop " agreements, it would be necessary for the defendant to discharge its then employees who were not members of the plaintiff union. But, in the absence of agreement, an employer's right to dispense with the services of his employees is unrestricted. That right may be exercised with or without cause. The proof does not disclose that the defendant was under any contractual obligation to the Empire State Union or that its members had any right to be continued in the defendant's employ.

The defendant argues that the discharge of the Empire State Union operators was based upon discrimination against their union and was motivated by reason of their union affiliation. The fallacy of the argument lies in its misplaced emphasis. The Empire State Union operators were discharged, not because of their union affiliations, but simply as an incident to performance of the " closed shop " agreements. Courts of this State, in passing upon section 7 (a) (U. S. Code, tit. 15, § 707, subsection [a]) have held that the Congress, in enacting the statute did not intend to prohibit " closed shop " agreements. (*Sherman* v. *Abeles*, 265 N. Y. 383; *Farulla* v. *Freundlich, Inc.*, supra; *Rosenthal-Ettlinger Co.* v. *Schlossberg*, 149 Misc. 210; *Buckingham Cafeteria, Inc.*, v. *Mesevich*, N. Y. L. J. Sept. 22, 1933, not officially reported.)

In my opinion the decision in the *Sherman* case is decisive of the point under consideration. There the defendant employers and the defendant union were charged with a conspiracy to accomplish, among other things, a boycott of the plaintiff union, a discharge of its members, and a refusal to re-employ them. The defendant union had entered into a " closed shop " agreement with the defendant employers. The court at Special Term found that with the execution of the " closed shop " agreement plaintiff union operators were discharged. In some instances they were supplanted by defendant union operators, and in others there were no displacements. The court also found that the defendant union was a company union, but refused to find that any one seeking employment from the defendant employer had been required as a condition of

employment to join the defendant union or " to refrain from joining, organizing, or assisting a labor organization of his own choosing." An order was entered restraining the defendant *pendente lite* from interfering with the right of their employees to bargain collectively through representatives of their own choosing, from violating section 7 (a), subdivision 2, of the NIRA (U. S. Code, tit. 15, § 707, subsection [a], subd. [2]) and from violating the provisions of the code with respect to the maximum hours of labor and minimum scale of wages fixed for projectionists in the defendant's employ. The court refused to direct the re-employment of the plaintiff union operators who had been discharged. From this refusal the plaintiff appealed to the Appellate Division, while the defendant appealed from the entire order. The order was affirmed without opinion (241 App. Div. 676). On appeal to the Court of Appeals the order was reversed (265 N. Y. 383), the court holding that neither subdivision 1 or 2 of section 7 (a) had been violated. It should be noted that not unlike the case at bar the Court of Appeals had before it a " closed shop " agreement, following the execution of which plaintiff union operators were discharged.

If the reasoning thus far be fallible, there nevertheless remains a complete answer to the defendant's claim. The defendant's brief vigorously asserts that its action was founded on the NIRA, the Motion Picture Code adopted under it, and the State Recovery Act, and that it was under the compulsion of these that the plaintiffs were discharged. But this assertion is met by the plaintiffs' argument that the NIRA and the code adopted under it have no application to the facts and that the State Recovery Act is unconstitutional.

That congressional justification for the NIRA is derived from the " commerce clause " of the United States Constitution is plainly apparent from a reading of the statute. The defendant concedes that, inasmuch as its business is conducted wholly within the State, with no feature of it involving or affecting interstate or foreign commerce, the provisions of the NIRA, standing alone, are inapplicable to the facts presented. The defendant's case is rested on the State Recovery Act (Laws of 1933, chap. 781). Section 1 thereof declares the existence of a national emergency, prevailing likewise in the State of New York, which burdens intrastate, interstate and foreign commerce, recognizes that the declaration of emergency contained in the NIRA relates as well to intrastate commerce within this State, and announces it to be the policy of the State " to co-operate in the furtherance of the objects and purposes declared in said act of the congress, and each and every provision of this act shall be construed in accordance with the policy so declared, and to make uniform the standards of fair competition

prevailing in intrastate commerce and industry with those of inter-state commerce required by the provisions of the said national industrial recovery act which are applicable in interstate commerce in the state of New York."

Section 2 provides for the filing with the Secretary of State of codes and agreements approved and licenses issued pursuant to the provisions of the NIRA affecting the conduct of business in the State. Violations of the codes or agreements so filed are declared to be misdemeanors punishable by a fine of not more than $500 for each offense and for each day such violation continues. Section 3 vests the Supreme Court with jurisdiction to restrain the violation of any code or agreement filed pursuant to this act and to restrain any act within the State tending to defeat or hamper the effective-ness and operation of the NIRA at the instance of any party whose interests are or may be adversely affected by such violations or acts.

The desirability of subjecting those engaged in intrastate com-merce within the State to the same standards of fair competition applicable to those engaged in interstate commerce within the State cannot be questioned. Nor may one doubt that the method adopted by the State to equalize standards of commercial conduct is calculated to prevent duplication with its attendant expense and perhaps confusion. But these considerations, salutary as they may be, cannot be employed as a means of leveling constitutional barriers. While the State Recovery Act does not purport to make the NIRA or any of the codes adopted thereunder the law of this State, it does provide that in the field of intrastate commerce violations of the Federal statute and the codes may be punished or restrained where such violations occur within the State. The Legislature has not alone declared a policy, but has created a new crime, the definition of which is left to agencies foreign to the State. By indirection, the entire machinery for the adoption of codes and agreements and the issuance of licenses under the Federal statute is carried into the State act. The question is whether this short cut to a perhaps desirable end is sanctioned by the State Constitution.

Section 17 of article 3 of the State Constitution reads as follows: " No act shall be passed which shall provide that any existing law, or any part thereof, shall be made or deemed a part of said act, or which shall enact that any existing law, or part thereof, shall be applicable, except by inserting it in such act."

In *People ex rel. N. Y. Electric Lines Co.* v. *Squire* (107 N. Y. 593, 602) the court said: " The object and intent of the consti-tutional provision was to prevent statute laws relating to one subject from being made applicable to laws passed upon another

subject, through ignorance and misapprehension on the part of the legislature, and to require that all acts should contain within themselves such information as should be necessary to enable it, to act upon them intelligently and discreetly."

While a constitutional provision intended to operate as a restraint upon the Legislature is not to be so construed as to embrace cases not fairly within its general purpose or policy (*People ex rel. Everson* v. *Lorillard*, 135 N. Y. 285, 288), it is not to be so construed as to nullify the constitutional limitation. In this case the court is not free to assume that the State Legislature was familiar with the terms and provisions of NIRA or that it was even familiar with its broad outlines. Nor can it be assumed that the law would have been adopted had the Legislature been fully acquainted with the NIRA. Whether the Legislature acted with full knowledge of what was being done or through ignorance or misapprehension is left to conjecture. For all that appears, the Legislature was not exercising its own judgment, but relying solely upon the wisdom of the Federal enactment. It has thus accomplished the very evil sought to be avoided by the constitutional prohibition.

Section 1 of article 3 of the State Constitution provides that " The legislative power  *  *  *  shall be vested in the Senate and Assembly." This power may not be abdicated by delegation to others. A Legislature may, however, delegate to some other agency of the government the power to determine facts and conditions upon which the operation of the statute depends. (*People ex rel. Doscher* v. *Sisson*, 222 N. Y. 387; *Matter of Trustees of Village of Saratoga Springs* v. *Saratoga Gas, Electric Light & Power Co.*, 191 id. 123.) That some future contingency controls the operation of the statute does not affect its validity. (*People ex rel. Unger* v. *Kennedy*, 207 N. Y. 533.) Once the legislative policy is outlined and its controlling general principles fixed, an administrative agency, within the limitations prescribed, may be charged with the duty of carrying the statute into operation. (*Panama Refining Co.* v. *Ryan*, 293 U. S. 388; 55 S. Ct. 241; 79 L. Ed. 223; *United States* v. *Shreveport Grain & El. Co.*, 287 U. S. 77; 53 S. Ct. 42; 77 L. Ed. 175; *United States* v. *Grimaud*, 220 U. S. 506; 31 S. Ct. 480; 55 L. Ed. 563; *Buttfield* v. *Stranahan*, 192 U. S. 470; 24 S. Ct. 349; 48 L. Ed. 525.)

It seems to have been assumed in all of the decisions on the subject that the administrative agency employed, if not the creature of the Legislature, is at least an agency of the State or government whose law is being executed. But here the Legislature has left the operation of the State statute, not to any State administrative agency, but to the President of the United States. Under the NIRA the President is empowered to adopt codes and agreements

affecting industries engaged in interstate commerce, and yet, if the State Recovery Act be upheld, the President would be given a like power over purely intrastate transactions. It may be urged that the Legislature, in exacting compliance with the codes and agreements in so far as they affect intrastate commerce within the State, has merely invoked the machinery existing under the NIRA as the most practical means of equalizing standards of fair competition. Assuming for the moment that the means adopted is more practical and convenient than the establishment by the State of its own code authorities modeled after the Federal system, that alone presents no justification for what has been done. Extreme caution should be exercised in safeguarding the State's sovereignty. The Legislature should neither invite Federal encroachment nor surrender to foreign agency, over which it has no control or supervision, powers given solely to it by the People. " Illegitimate and unconstitutional practices get their first footing * * * by silent approaches and slight deviations from legal modes of procedure." (*Boyd* v. *United States*, 116 U. S. 616, 635; 6 S. Ct. 524, 535; 29 L. Ed. 746.) While co-operation between the State and Federal government for the achievement of some end may be highly desirable, such co-operative action must not involve an obliteration of State lines and a surrender of the State's inherent powers.

It may be said that no harm can result and much good may be accomplished by upholding this particular legislation. But, if the State's power to delegate governmental functions to a foreign agency is sanctioned, there can be no legitimate limits to its exercise. As was said by Chief Justice MARSHALL in *Brown* v. *Maryland* (12 Wheat. 419, 439; 6 L. Ed. 678): " Questions of power do not depend on the degree to which it may be exercised. If it may be exercised at all, it must be exercised at the will of those in whose hands it is placed." The vice of the State Recovery Act lies in the fact that the procedure therein adopted, if approved, will facilitate subservience by the State or by its political subdivisions to a foreign entity not representative of, or responsible to, the citizens of the State whose local interests are being affected. The dangerous implications involved in any such state of affairs must be apparent.

In *Darweger* v. *Staats* (153 Misc. 522)* the court, on an application for a temporary injunction restraining the members of the Divisional Code Authority of the Retail Solid Fuel Industry from interfering with the conduct of the plaintiff's business, fixing or attempting to fix the price at which he might sell his products within the State, or instituting proceedings against him for violation of the code provisions, held the State Recovery Act unconstitutional. In doing so, it was observed that " the legislative power is vested

* Affd., 243 App. Div. 380; 267 N. Y. 290.

in the Senate and Assembly. The nation is still an 'indivisible union of indestructible states.' The State within its boundaries is sovereign. The laws that govern its citizens in purely intrastate matters within its borders and the acts which will convert its citizens into criminals must be those specified by the State and its authority." The Legislature cannot delegate the sovereign powers of the State to an administrative or executive authority of a foreign jurisdiction. It cannot surrender the sovereignty of the State to declare " the acts constituting a crime to Federal executive or administrative authority." (153 Misc. 529.) The opinion contains an excellent *résumé* of the authorities together with the conflicting decisions which have arisen under the State Recovery Act. Recently the Appellate Division of the First Department (*Matter of Sabatini* v. *Andrews*, 243 App. Div. 109, 114), in upholding the constitutionality of the State Recovery Act, said: " It is claimed that this [establishment of standards of fair competition of intrastate business by filing codes and agreements in the office of the Secretary of State] amounts to an unlawful delegation of legislative power. We do not think so. In *Moses* v. *Guaranteed Mortgage Co.* (239 App. Div. 703), we expressed a contrary view, but we were overruled by the court of last resort in this State in *Matter of People* (*Title & Mortgage Guarantee Co.*) (264 N. Y. 69)."

The latter decision dealt with chapter 40 of the Laws of 1933, giving the Superintendent of Insurance certain wide powers. True, the question of delegation of legislative power to an executive officer was involved, but there the similarity stops, since the delegation was to a State official, whereas the State Recovery Act undertakes to delegate power either to the President of the United States or to a foreign body created under congressional act, or to the business representatives constituting the various code authorities.

On all of the grounds stated, there will be judgment for the plaintiffs and, if necessary, a reference to an official referee to ascertain the plaintiffs' damages.